No. 19-1614

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MAYOR AND CITY COUNCIL OF BALTIMORE,
Plaintiff-Appellee,

v.

ALEX M. AZAR II, in his official capacity as Secretary of the United
States Department of Health and Human Services, et al.,
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**EMERGENCY MOTION FOR REHEARING EN BANC
TO VACATE STAY OF INJUNCTION**

Andre M. Davis
*City Solicitor*
Suzanne Sangree
*Senior Counsel for Public Safety &
  Director of Affirmative Litigation*
CITY OF BALTIMORE
DEPARTMENT OF LAW
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
andre.davis@baltimorecity.gov
suzanne.sangree2@baltimorecity.gov

Andrew T. Tutt
Drew A. Harker
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

Stephanie Toti
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
646-490-1083
stoti@lawyeringproject.org

*Counsel for Appellee Mayor and City Council of Baltimore*
(additional counsel listed on following page)

Priscilla J. Smith
REPRODUCTIVE RIGHTS &
JUSTICE PROJECT AT
YALE LAW SCHOOL
319 Sterling Place
Brooklyn, NY 11238
priscilla.smith@ylsclinics.org

Faren M. Tang
REPRODUCTIVE RIGHTS &
JUSTICE PROJECT AT
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
faren.tang@ylsclinics.org

*Counsel for Appellee Mayor and City Council of Baltimore*

## **RULE 35(b) STATEMENT**

This case warrants emergency intervention by the en banc Court because the panel decision directly and irreconcilably conflicts with *Nken v. Holder*, 556 U.S. 418 (2009) and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

This case also warrants emergency intervention by the en banc Court because it involves an exceptionally important question, namely, whether the City of Baltimore, its healthcare system, and its people, should be subject to extraordinary and irreparable harm where the HHS regulation inflicting those harms is clearly and indisputably unlawful.

## **TABLE OF CONTENTS**

**Page**

PETITION FOR REHEARING EN BANC ................................................. 1

I.     THE PANEL CLEARLY AND DEMONSTRABLY
       MISAPPLIED *NKEN V. HOLDER* BY ENTERING A STAY
       WITHOUT REQUIRING ANY SHOWING OF LIKELIHOOD
       OF IRREPARABLE HARM .............................................................. 5

II.    THE PANEL CLEARLY AND DEMONSTRABLY ERRED IN
       ITS APPLICATION OF TWO DIFFERENT FEDERAL
       STATUTES ....................................................................................... 9

III.   EN BANC REHEARING IS EXCEPTIONALLY IMPORTANT
       BECAUSE THE STAY IS NOW INFLICTING
       EXTRAORDINARY AND IRREPARABLE HARMS ON
       BALTIMORE, ITS HEALTHCARE SYSTEM, AND ITS
       PEOPLE .......................................................................................... 14

CONCLUSION ............................................................................................ 16

CERTIFICATE OF COMPLIANCE .......................................................... 19

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s):**

*California v. Azar,*
  No. 3:19-cv-01184-EMC (N.D. Cal. Apr. 26, 2019),
  ECF No. 103 ................................................................. 2

*C.J.L.G. v. Barr,*
  923 F.3d 622 (9th Cir. 2019)...................................... 3

*C.J.L.G. v. Sessions,*
  904 F.3d 642 (9th Cir. 2018)...................................... 3

*Garza v. Hargan,*
  874 F.3d 735 (D.C. Cir. 2017) (en banc) ................. 4

*Gilliam v. Foster,*
  61 F.3d 1070 (4th Cir. 1995) (en banc) ................... 4

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned
  by Sandra Townes Powell,*
  915 F.3d 197 (4th Cir. 2019)...................................... 6

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................... 3, 4, 9

*SAS Inst., Inc. v. World Programming Ltd.,*
  874 F.3d 370 (4th Cir. 2017).................................... 5

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .............................................. 4, 5, 9

## Statutes, Rules & Regulations

18 U.S.C. § 18114................................................... 10, 13

Fed. R. App. P. 35 ..................................................... 4

Fed. R. App. P. 35(a) ................................................. 4

Fed. R. App. P. 35(b)(1)(A) ................................................................. 4

Fed. R. App. P. 35(b)(1)(B) ................................................................. 4

42 C.F.R. § 59.5(a)(5) ..................................................................... 10

42 C.F.R. § 59.14(a) ....................................................................... 10

42 C.F.R. § 59.14(b)(1) .................................................................... 10

42 C.F.R. § 59.14(b)(1)(ii) ............................................................... 11

42 C.F.R. § 59.14(c)(2) .................................................................... 11

*Compliance With Statutory Program Integrity Requirements*,
    84 Fed. Reg. 7714 (Mar. 4, 2019) ................................................. *passim*

Continuing Appropriations Act for 2019, Pub. L. 115–245,
    132 Stat. 2981, 3070–71 (Sept. 28, 2018) ........................................ 9, 12

## PETITION FOR REHEARING EN BANC

This case warrants emergency intervention by the en banc Court. The Mayor and City Council of Baltimore ("Baltimore") is facing a public health crisis. At this very moment Baltimore and countless other Title X providers throughout Maryland have ceased offering the full range of high quality Title X services. Thousands of low-income women, men, and adolescents in Maryland are suddenly stranded without adequate access to counseling and referrals to critical health services. Baltimore, its healthcare system, its doctors, and its people are experiencing concrete and tangible medical harms right now. These harms are serious and they are irreparable.

This dire situation is the result of a stay entered by a sharply divided panel extinguishing a preliminary injunction that had, until yesterday, been protecting Baltimore from this disastrous result. Pet.Add.1-5. Because of the panel's decision, many of the provisions of an unlawful new HHS Rule—*Compliance With Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019) ("the Rule")— have now taken effect in the State of Maryland threatening the viability of a program that has successfully reduced unintended pregnancy, teen

pregnancy, and abortions for women in the United States over the last fifty years. The Rule fundamentally alters the grant conditions that attach to grant awards in the "Title X program"—a 50-year-old program that provides pre-pregnancy reproductive health services to four million low-income women and men nationwide, including a broad range of effective and acceptable contraceptive methods on a voluntary and confidential basis, contraceptive education and counseling; breast and cervical cancer screening; testing, referral, and prevention education for sexually transmitted infection (STI) and human immunodeficiency virus (HIV); and pregnancy diagnosis and counseling. In Baltimore alone, approximately 16,000 patients obtain critical reproductive health care from Title X providers each year.

The district court entered the preliminary injunction in this case with great care and circumspection. After examining hundreds of pages of filings, including unrebutted declarations from eight individuals with relevant expertise, Dkt.15-2.Supp.Add.249-620, and decisions issued by three other district courts granting preliminary injunctions, including Judge Chen's powerful 80-page opinion in *California v. Azar*, Dkt.15-2.Supp.Add.20-97, and holding four hours of oral argument,

Dkt.15-2.Supp.Add.657-775, the court issued a 30-page opinion setting forth the basis for its decision. *See* Pet.Add.11-38.  The district court similarly denied defendants' motion to stay the injunction in a carefully written opinion.  Pet.Add.6-9.  The panel stayed the injunction without opinion and over a vigorous dissent by Judge Thacker.  Pet.Add.1-5.

The en banc court should grant emergency rehearing and vacate the order staying the injunction in this case as soon as possible.  It has the clear power to do so.  For example, earlier today the Ninth Circuit granted rehearing en banc of a similar decision staying three preliminary injunctions against the Rule, vacated the stay and panel opinion, ordered that the panel opinion shall have no precedential effect on the merits panel, and ordered that the panel opinion "shall not be cited as precedent by or to any court of the Ninth Circuit."  Pet.Add.39-41; *see C.J.L.G. v. Barr*, 923 F.3d 622, 626 (9th Cir. 2019) (noting that upon grant of rehearing en banc "the panel opinion was vacated"); *C.J.L.G. v. Sessions*, 904 F.3d 642, 642 (9th Cir. 2018) (order granting rehearing en banc, not mentioning anything about vacatur, but noting only that "[t]he three-judge panel disposition in this case shall not be cited as precedent by or to any court of the Ninth Circuit").

Rule 35 provides that "[a] majority of the circuit judges who are in regular active service and who are not disqualified may order that an appeal *or other proceeding* be heard or reheard by the court of appeals en banc." Fed. R. App. P. 35(a) (emphasis added). Baltimore's motion to vacate the stay may therefore be considered by the Court en banc. *See, e.g.*, *Gilliam v. Foster*, 61 F.3d 1070, 1073 (4th Cir. 1995) (en banc) (issuing a TRO after district court and panel each denied motions for extraordinary relief); *Garza v. Hargan*, 874 F.3d 735, 736 (D.C. Cir. 2017) (en banc) (intervening to grant extraordinary interim relief).

Rule 35 provides that en banc consideration will be ordered if a "panel decision conflicts with a decision of the United States Supreme Court," Fed. R. App. P. 35(b)(1)(A), or "the proceeding involves one or more questions of exceptional importance." *Id.* 35(b)(1)(B). Both prongs are met here. First, the panel clearly and demonstrably misapplied the stay standard set forth in *Nken v. Holder*, 556 U.S. 418 (2009) and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), granting the stay without any evidence that the government would suffer irreparable harm. And second, Baltimore is now suffering irreparable harms of exceptional importance as a result of the

implementation of an HHS Rule that is clearly and indisputably unlawful. Only an emergency en banc order vacating the panel's stay order and restoring the preliminary injunction can prevent further irreparable harm to the City, its health system, its physicians, its people, and all those who rely on its health system.

## I. THE PANEL CLEARLY AND DEMONSTRABLY MISAPPLIED *NKEN V. HOLDER* BY ENTERING A STAY WITHOUT REQUIRING ANY SHOWING OF LIKELIHOOD OF IRREPARABLE HARM

The panel clearly and demonstrably misapplied the *Nken* standard. First, and most seriously, it failed to require the Government to make any showing of "irreparable harm" absent a stay in this case, as *Nken* requires. *See Winter*, 555 U.S. at 21-22 (holding that courts may not issue preliminary injunctions based on the mere "possibility" of irreparable harm); *Nken*, 556 U.S. at 433 (explaining that, in light of *Winter*, a party must at minimum show a likelihood of irreparable harm to obtain a stay); *accord SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386 (4th Cir. 2017) ("[T]he Supreme Court has made clear that, regardless of the other factors," equitable relief "is unavailable absent a showing of irreparable injury." (internal marks omitted)).

5

Defendants' supposed harms absent a stay in this case are not cognizable harms at all, and certainly not irreparable harms. To be irreparable harm, a claimed injury must be "neither remote nor speculative, but actual and imminent," incapable of being "rectified by the final judgment after trial," and of such importance that there is a clear and present need for equitable relief to prevent irreparable harm. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019).

Defendants' claimed harms arising out of the preliminary injunction are self-described "administrative burdens": "uncertainty," "disruption," and "delay" in implementing the Rule. Dkt.9,16-18. Those harms are inconsequential and far from irreparable—especially because the status quo has been in place for 50 years. As Judge Thacker explained, dissenting from the order granting the stay, Defendants "harms" are all "grounded in [the] purported inconvenience and nuisance of not knowing when and if the Final Rule will become effective." Pet.Add.4-5 (Thacker, J., dissenting). "Inconvenience" and "nuisance" are not irreparable harms and cannot form the basis for a stay. Not only are Defendants' harms non-existent, but Defendants utterly failed to put

6

any evidence into the record establishing that these alleged harms would even in fact happen.

The same fundamental and basic error that afflicts the panel's decision also afflicts the decision of a Ninth Circuit panel that stayed three injunctions issued by three different district courts in the Ninth Circuit two weeks ago. Dkt.9.Add.38-62. The Ninth Circuit stay panel issued a 25-page precedential *per curiam* opinion—binding on the merits panel—without holding oral argument on the motion. The stay panel's actions were irregular and seemingly unprecedented and the stay and the opinion have been vacated. Pet.Add.39-41. And that stay panel's *entire* discussion of harm to the government arising from the preliminary injunctions in the Ninth Circuit was as follows:

> Absent a stay, HHS will be forced to allow taxpayer dollars to be spent in a manner that it has concluded violates the law, as well as the Government's important policy interest (recognized by Congress in § 1008) in ensuring that taxpayer dollars do not go to fund or subsidize abortions. As the Supreme Court held in *Rust*, "the government may 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds," and by "declining to 'promote or encourage abortion.'" *Rust*, 500 U.S. at 193. Additionally, forcing HHS to wait until the conclusion of a potentially lengthy appeals process to implement the Final Rule will necessarily result in predictable administrative costs, and will beget significant uncertainty in the Title X program.

Dkt.9.Add.61. The premise of the first part of the discussion above is in fact erroneous because the Government has not argued that the current regulations are unlawful. Thus "taxpayer dollars" are *not* being "spent in a manner that [the Government] has concluded violates the law." *Id.* This is a *Chevron* "Step Two" case. The Rule is an HHS policy choice, not a Congressional mandate. And in any event, it is the role of the Courts, not a government agency, to determine what the law is. The injunction is merely delaying implementation of a radical new policy Defendants want to see put into place sooner.

The remaining harms recited by the Ninth Circuit stay panel are insignificant and surely not irreparable. By the logic of the Ninth Circuit stay panel, the existing Title X regulations—regulations that have been in place for the entire 50-year history of Title X—are now inflicting irreparable harm on the Government. That is hard to fathom, if not absurd on its face. And the claimed "uncertainty" and "administrative costs" arising from the preliminary injunctions— borrowed apparently verbatim from the Government's briefs—are, like the claims in the Government's briefs, supported by no evidence. Moreover, the "uncertainty" facing the government pales in comparison

to the uncertainty currently facing Title X providers in Maryland, who have been forced to indefinitely suspend provision of the full range of Title X services overnight.

The panel's failure to require Defendants to make a showing of an actual likelihood of irreparable harm absent a stay warrants intervention by the en banc court. The Supreme Court has squarely held that granting a stay based on the mere "possibility" of irreparable harm "is too lenient." *Winter*, 555 U.S. at 22; *Nken* 556 U.S. at 434-35. The panel's clear failure to correctly apply *Nken* and *Winter*—especially in the context of a case in which the Plaintiff stands to suffer immediate, serious, concrete, irreparable harms as a result of the error—warrants emergency rehearing en banc.

## II. THE PANEL CLEARLY AND DEMONSTRABLY ERRED IN ITS APPLICATION OF TWO DIFFERENT FEDERAL STATUTES

Second, the stay panel clearly and demonstrably erred in its application of two different provisions of federal law. The Nondirective Mandate—included in every Title X appropriation since 1996—requires "that all pregnancy counseling shall be nondirective." Continuing Appropriations Act for 2019, Pub. L. 115–245, 132 Stat. 2981, 3070–71

(2018). And the Non-Interference Mandate, enacted as part of the Affordable Care Act ("ACA"), provides that HHS "shall not promulgate any regulation that," among other things, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "interferes with communications regarding a full range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," or "violates the principles of informed consent and the ethical standards of health care professionals." 18 U.S.C. § 18114.

The Rule violates these prohibitions in numerous ways. First, The Rule imposes a "Gag Rule" that restricts the ability of most personnel at Title X providers to engage in any pregnancy counseling at all, and mandates that providers steer patients away from abortion and toward prenatal care by prohibiting abortion referrals, even for patients who request them, and mandating prenatal referrals, even for patients who do not want them. *See* 42 C.F.R. §§ 59.5(a)(5), 59.14(a), 59.14(b)(1).

A Title X project responding to a patient's request for an abortion referral can, at most, provide a list on which more than half the

providers do not provide abortions, *Id.* § 59.14(b)(1)(ii), (c)(2), the abortion providers on the list are only those that also provide comprehensive primary health care, (i.e., the list must exclude those who are often the most cost-effective, appropriate providers). *Id.* § 59.14. And the project cannot tell the patient which of the providers actually perform abortions, or that the list omits the most cost-effective and convenient providers. *Id.* § 59.14(c)(2). In Baltimore, for example, this would require omitting all of the specialized reproductive healthcare providers from the referral list, and instead directing patients toward facilities that charge nearly *ten times* the cost. Dkt.15-2.Supp.Add.569¶60. Complying with these requirements would constitute a "gross violation of the core ethical obligations of medical professionals." Dkt.15-2.Supp.Add.525-26¶27.

Second, the Rule also imposes a "Separation Requirement" that mandates that providers who allow personnel to make referrals for pregnancy termination must locate those personnel in physically and financially separate facilities—with separate entrances, separate digital medical record systems, under different business names, and with different phone numbers and email addresses. 42 C.F.R. § 59.15. As

11

unrebutted evidence shows, that will cost most providers hundreds of thousands of dollars they do not have. *E.g.*, Dkt.15-2.Supp.Add.268-69¶¶56-58.

The Nondirective Mandate provides that "all pregnancy counseling shall be nondirective." Pub. Law. No. 115-245, Title II, 132 Stat. 2981, 3070-71 (Sept. 28, 2018). The Rule violates the Nondirective Mandate by barring providers from referring patients for abortion and by compelling providers to refer patients for pre-natal care. *See* 84 Fed. Reg. 7759, 7788-90; *see* Pet.Add.30. Referrals are a type of counseling, as dictionaries, Congress's usage in other statutes, HHS's own usage in the Rule, and the understanding of the medical community, all confirm. *See* Dkt.15-1 at 18-19 (citing dictionaries); Pet.Add.29-30. Thus, the Rule's requirement to engage in directive referrals indisputably violates the Nondirective Mandate. As Judge Bennett explained:

> Requiring providers to refer a patient to prenatal health care even when the patient has expressly stated that she does not want prenatal care is coercive, not "nondirective." Requiring providers to provide a referral list that is limited to those that do not provide abortion, even if the client specifically requests an abortion referral, is coercive, not "nondirective." Requiring providers to exclude abortion as one of multiple options available to a client facing an unwanted pregnancy, especially if she has asked about that option, is coercive, not "nondirective."

12

Pet.Add.30.

The Rule also violates every provision of the ACA Non-Interference Mandate.  The Mandate bars HHS from promulgating "any regulation" that, among other things, interferes with timely access to adequate care, interferes with the doctor-patient relationship, or prevents physicians from complying with the ethical standards of health care professionals.  42 U.S.C. § 18114.  As Judge Thacker explained about the Non-Directive Mandate's informed consent provision in particular: "*I cannot fathom a more direct violation of this provision* than a regulation prohibiting Title X health care providers from referring a woman for an abortion when she requests it." Pet.Add.3 (Thacker, J., dissenting) (emphasis added).  The panel majority offered no response to this observation because there is none.

The panel's clear and demonstrable legal errors—especially in light of the harms resulting from those errors—calls for emergency rehearing en banc.

13

### III. EN BANC REHEARING IS EXCEPTIONALLY IMPORTANT BECAUSE THE STAY IS NOW INFLICTING EXTRAORDINARY AND IRREPARABLE HARMS ON BALTIMORE, ITS HEALTHCARE SYSTEM, AND ITS PEOPLE

This case is exceptionally important. The stay entered by the panel is inflicting extraordinary, concrete, and irreparable harms on Baltimore, its healthcare system, and its people *right now*. Eight different witnesses—including a leading medical ethicist; experts on public health, Title X, and medical access and delivery of care; and top officials in Baltimore's Health Department—all provided unrebutted declarations explaining how the Rule would irreparably harm Baltimore. *See, e.g.*, Dkt.15-2.Supp.Add.363-376¶¶31,47,52-55,562¶26,582-583¶¶34-35. Now their predictions are coming to pass.

The Rule is causing Baltimore, its healthcare system, and its people immediate irreparable harm by (1) forcing Baltimore to stop providing the full range of Title X services, and but also the withdrawal of numerous other providers, stranding many thousands of individuals without access to adequate medical care; and (2) forcing those providers that remain in the program to provide medical care that is deeply

14

unethical and inconsistent with the doctor's most basic duty to "do no harm." *E.g.* Dkt.15-2.Supp.Add.570¶64.

Moreover, for both reasons, the Rule will cause an "inevitabl[e] increase" in unintended pregnancies (including teen pregnancies), sexually transmitted infections, cervical cancer, and other collateral consequences for Baltimore and its healthcare system. Dkt.15-2.Supp.Add.324¶82. In Baltimore, the Rule puts at risk evidence-based high quality clinical care and counseling for the 16,000 patients; 22,000 clinical visits; 2,800 annual exams; and diagnosis and treatment of 8,746 cases of chlamydia, 18,925 cases of gonorrhea, 5,283 cases of syphilis, and 8,174 cases of HIV provided by existing Title X providers annually. Dkt.15-2.Supp.Add.573-75¶¶5-10. It risks the 55% reduction in teen pregnancy that Baltimore's public health system has achieved over the last ten years, Dkt.15-2.Supp.Add.588-89¶12. It risks increasing unintended pregnancies by 822,300 each year nationwide. Dkt.15-2.Supp.Add.286¶103. It risks the $147,766,000 in government healthcare costs *saved* by the Title X program in Baltimore alone. Dkt.15-2.Supp.Add.577¶21. If any Baltimore providers do accept Title X funding subject to the Rule, compliance with the Gag Rule will force

15

those providers to violate medical ethics, provide incomplete medical advice and information, and "eviscerate patient trust" in medical providers, causing harm well into the future when Baltimore patients delay or avoid seeking needed medical care as a result. Dkt.15-2.Supp.Add.564-67¶¶37-53.

The harms Baltimore is now confronting are exceptional and irreparable. Only a finding that Defendants were likely to suffer true irreparable harm absent a stay, and a firm conviction that the Rule is clearly lawful, could justify inflicting those harms on Baltimore. But the panel clearly and demonstrably failed to require the Government to meet either requirement. Those serious errors warrant prompt emergency intervention by the en banc Court.

## CONCLUSION

The Court should grant emergency rehearing en banc and vacate the stay order.

July 3, 2019                          Respectfully submitted,

s/ Andre M. Davis                    s/ *Andrew Tutt*
Andre M. Davis                       Andrew T. Tutt
*City Solicitor*                     Drew A. Harker
Suzanne Sangree                      ARNOLD & PORTER KAYE
*Senior Counsel for Public Safety &* SCHOLER LLP
  *Director of Affirmative Litigation* 601 Massachusetts Ave., NW
CITY OF BALTIMORE                    Washington, DC 20001
DEPARTMENT OF LAW                    (202) 942-5000
City Hall, Room 109                  andrew.tutt@arnoldporter.com
100 N. Holliday Street
Baltimore, MD 21202                  Stephanie Toti
443-388-2190                         LAWYERING PROJECT
andre.davis@baltimorecity.gov        25 Broadway, Fl. 9
suzanne.sangree2@baltimorecity.gov   New York, NY 10004
                                     646-490-1083
Priscilla J. Smith                   stoti@lawyeringproject.org
REPRODUCTIVE RIGHTS &
JUSTICE PROJECT AT
YALE LAW SCHOOL
319 Sterling Place
Brooklyn, NY 11238
priscilla.smith@ylsclinics.org

Faren M. Tang
REPRODUCTIVE RIGHTS &
JUSTICE PROJECT AT
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
faren.tang@ylsclinics.org


*Counsel for Appellee Mayor and City Council of Baltimore*

17

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Emergency Motion for Rehearing En Banc to Vacate Stay of Injunction was filed electronically on July 3, 2019 and will, therefore, be served electronically upon all counsel.

s/ *Andrew Tutt*

Andrew T. Tutt

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned counsel for appellee certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this brief contains 3,106 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

s/ *Andrew Tutt*
Andrew T. Tutt